UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                                :
EAST SIDE ENTREES INC.,
                                                :     09 CV-1759 (DRH) (ARL)
                            Plaintiff,
                                                :
        - against -
                                                :
ACOSTA, INC. and MATCHPOINT
MARKETING, LLC,                                 :     **SECOND AMENDED COMPLAINT**

                            Defendants.    :

-------------------------------------------------------X

        Plaintiff, East Side Entrees, Inc., by its attorneys, Ingram Yuzek Gainen Carroll &

Bertolotti, LLP, for its second amended complaint against defendants, Acosta, Inc. and MatchPoint

Marketing, LLC, alleges as follows:

### Jurisdiction

        1.      This Court has jurisdiction over this action under 28 U.S.C. § 1332 based

on diversity of citizenship of the parties. Plaintiff is a corporation incorporated under the laws of

the State of New York having its principal place of business in the State of New York. Upon

information and belief, defendant Acosta, Inc. is a corporation incorporated under the laws of,

and has its principal place of business in, a state other than New York. Upon information and

belief, defendant MatchPoint Marketing, LLC is an entity formed under the law of, and has its

principal place of business in, a state other than New York. The matter in controversy exceeds,

exclusive of interest and costs, the sum of $75,000.

## The Parties

2.     Plaintiff, East Side Entrees, Inc., is a New York corporation, with principal offices at 20 Crossways Park North, Woodbury, New York. East Side's business includes, among other things, manufacturing, selling and distributing food products to schools and through retail channels.

3.     Upon information and belief, defendant Acosta, Inc. is a Delaware corporation, with principal offices at 6600 Corporate Center Parkway, Jacksonville, Florida. Acosta promotes itself on its website as "North America's leading, marketing and service company."

4.     Upon information and belief, defendant MatchPoint Marketing, LLC is a Delaware limited liability company, with principal offices at 6600 Corporate Center Parkway, Jacksonville, Florida. MatchPoint, which is one of Acosta's wholly-owned subsidiaries, holds itself out as a full-service consumer promotions agency.

## Background

5.     In April 2007, East Side and Acosta entered into a Sales Agent Contract (the "Acosta Agreement"), under which Acosta agreed to perform services as East Side's exclusive sales agency in the defined territory for an East Side product known as "Breakfast Breaks." A copy of the Acosta Agreement is attached as Exhibit A.

6.     Breakfast Breaks is a product that consists of a colorful and attractive package that contains a General Mills® cereal Bowl Pack™, a nutritious snack, and Minute Maid® 100% Fruit Juice. The kit also includes a spoon, napkin and moist wipe.

7.      In September 2007, East Side entered into an Advertising and Promotions Agency Agreement with MatchPoint (the "MatchPoint Agreement"), Acosta's captive advertising and marketing company.  Under the MatchPoint Agreement, MatchPoint agreed to handle all aspects of developing, implementing and managing all advertising, marketing and related services in support of the Breakfast Breaks retail launch.  A copy of the MatchPoint Agreement is attached as Exhibit B.

8.      East Side engaged MatchPoint on Acosta's strong recommendation.  Acosta made clear to East Side that the only way for East Side, a relatively small Acosta client, to receive Acosta's attention and focus was also to hire MatchPoint and thereby strengthen East Side's ties and commitment to Acosta.

9.      Before engaging them, East Side advised Acosta and MatchPoint of the great importance of the Breakfast Breaks product to East Side's financial health and success.  East Side also advised Acosta and MatchPoint that this was its first venture into the retail market and intended to rely fully on the direction and expertise of Acosta and MatchPoint to guide East Side through the process and make Breakfast Breaks a success.

10.     Both before and during the time Acosta and MatchPoint represented East Side, they repeatedly assured East Side that they were highly-experienced and expert in the areas for which East Side was hiring them, would perform to the highest standards of their respective industries, use their best efforts to promote public awareness of Breakfast Breaks and substantially increase East Side's sales.  East Side reasonably relied upon Acosta's and MatchPoint's representations and assurances, and reasonably expected them to perform as promised.

11.     Unfortunately, as it turned out, MatchPoint had induced East Side to sign-on by overstating and misrepresenting its capabilities and expertise in certain aspects of the services they were to perform for East Side.   Moreover, MatchPoint's Client Services Director, who was responsible for implementing the media spend program that MatchPoint had developed for East Side, concealed from East Side that she had engaged her own husband to perform all media buying services for East Side.   East Side would not have hired MatchPoint had it known of MatchPoint's limited capabilities, or that it would proceed on the basis of this egregious conflict of interest.

### Acosta and MatchPoint's Poor Performance

12.     Acosta failed to perform, and performed negligently, in a number of respects. As a few examples of Acosta's failures:

      (a)    Acosta failed properly or effectively to represent Breakfast Breaks to the trade;

      (b)    Acosta failed properly or effectively to provide operational retail oversight;

      (c)    Acosta failed properly or effectively to manage in-store presentations; and

      (d)    Acosta overcharged East Side.

13.     MatchPoint also failed to perform, and performed negligently, in a number of respects. As a few examples of MatchPoint's failures:

      (a)    MatchPoint failed properly or effectively to coordinate and manage third-party in-store demonstrations;

      (b)    MatchPoint developed and implemented an ill-conceived marketing plan, which completely failed;

      (c)    MatchPoint recommended and implemented a marketing launch before sufficient product placement had been achieved;

      (d)    MatchPoint poorly managed in-store promotional programs;

(e)     MatchPoint induced East Side to make over-budget
        advertising commitments that proved to be of no benefit to
        East Side; and

(f)     MatchPoint overcharged East Side.

14.     As a result of Acosta's and MatchPoint's breaches, non-disclosures, failures,
negligence and false promises, the Breakfast Breaks retail launch has been a disaster, to East Side's
overwhelming detriment.  As Acosta and MatchPoint knew, East Side projected $16,000,000 in
Breakfast Breaks sales for the first six months of 2008; East Side actual sales for that period totaled
less than $2,000,000.

15.     As another measure of just how ineffective Acosta and MatchPoint have
been, average sales of Breakfast Breaks per retail location during the first six months of 2008—with
Acosta and MatchPoint's combined efforts (and hefty fees) and with East Side's multi-million
dollar media spend as recommended and implemented by MatchPoint through its Client Services
Director's husband—actually *decreased* in comparison to the last six months of 2007.

16.     To date, East Side has paid to Acosta and MatchPoint more than $2,000,000.
And, notwithstanding their inadequate and ineffective performance, and the substantial damages
they have caused East Side, MatchPoint contends that East Side owes it an additional $2,894,441.

17.     East Side has performed all conditions on its part to be performed under the
Acosta Agreement and the MatchPoint Agreement.

### First Claim
### Breach of Contract – Acosta Agreement
### (Against Acosta)

18.     East Side repeats the allegations of paragraphs 1 to 17 of the second
amended complaint.

19.     Acosta breached the Acosta Agreement.

20.     As a result of Acosta's breach, East Side has suffered actual and

consequential damages in an amount to be determined at trial.

### Second Claim
### Breach of Contract – MatchPoint Agreement
### (Against MatchPoint)

21.     East Side repeats the allegations of paragraphs 1 to 20 of the second

amended complaint.

22.     MatchPoint breached the MatchPoint Agreement.

23.     As a result of MatchPoint's breach, East Side has suffered actual and

consequential damages in an amount to be determined at trial.

### Third Claim
### Negligence
### (Against Acosta)

24.     East Side repeats the allegations of paragraphs 1 to 23 of the second

amended complaint.

25.     Acosta negligently performed its services under the Acosta Agreement.

26.     As a result of Acosta's negligence, East Side has suffered actual and

consequential damages in an amount to be determined at trial.

## Fourth Claim
### Negligence
### (Against MatchPoint)

27.     East Side repeats the allegations of paragraphs 1 to 26 of the second

amended complaint.

28.     MatchPoint negligently performed its services under the MatchPoint

Agreement.

29.     As a result of MatchPoint's negligence, East Side has suffered actual and

consequential damages in an amount to be determined at trial.

## Fifth Claim
### Fraud in The Inducement
### (Against MatchPoint and Acosta)

30.     East Side repeats the allegations of paragraphs 1 to 29 of the second

amended complaint.

31.     Acosta and MatchPoint fraudulently induced East Side to enter into the

MatchPoint Agreement.

32.     Acosta and MatchPoint represented to East Side before the parties entered

into the MatchPoint Agreement that MatchPoint was highly-experienced and expert in the areas for

which East Side was hiring it, would perform to the highest standards of its industry, use its best

efforts to promote public awareness of Breakfast Breaks and substantially increase East Side's sales.

33.    East Side believed and reasonably relied upon Acosta's and MatchPoint's representations and assurances (the "Representations") in entering into the MatchPoint Agreement and reasonably expected MatchPoint to perform as promised.

34.    The Representations were false.

35.    On information and belief, Acosta and MatchPoint knew that the Representations were false.

36.    As a result of Acosta and MatchPoint's fraudulent representations, East Side has suffered actual and consequential damages in an amount to be determined at trial.

### Sixth Claim
### Breach of Contract – Settlement Stipulation
### (Against Acosta)

37.    East Side repeats the allegations of paragraphs 1 to 36 of the second amended complaint.

### The New York and Florida Arbitrations

A.    The New York Arbitration

38.    On August 11, 2008, East Side, in accordance with the arbitration provision in the MatchPoint Agreement filed an arbitration demand with JAMS in New York City against Acosta and MatchPoint (the "New York Arbitration").

B.      The Florida Arbitration

39.     After receiving notice of East Side's filing, Acosta filed an arbitration

demand with the American Arbitration Association in Florida, seeking to recover approximately

$100,000 in unpaid commissions that East Side purportedly owed Acosta (the "Florida

Arbitration").

The Parties' Stipulations

40.     After extensive negotiations, the parties entered into two stipulations, one in

the New York Arbitration (the "New York Stipulation") and one in the Florida Arbitration (the

"Florida Stipulation"). A copy of the New York and Florida Stipulations are attached as Exhibits C

and D, respectively.

A.      The New York Stipulation

41.     In the New York Arbitration, the parties stipulated, among other things:

(a) Paragraph 1: Acosta shall be dismissed from the arbitration
proceeding without prejudice. The claims of East Side against MatchPoint Marketing, LLC
("MatchPoint") and MatchPoint against East Side shall remain unaffected. The final
hearing date shall remain the same. *East Side and MatchPoint shall conduct and conclude
further good-faith settlement discussions by no later than March 30, 2009.* (Emphasis
supplied.)

(b) Paragraph 4:    East Side shall pay to Acosta care of its undersigned
counsel the sum of $61,341.00 by delivering said funds no later than March 23, 2009.

42.     East Side's principal purpose and intended benefit in entering into the New

York Stipulation was to have the parties commit to conducting and concluding good-faith

settlement discussions in short order, reach an agreement and move on. Without this provision and

promise, East Side would not have entered into the New York Stipulation.

43.     It was also important to East Side that the parties agree to conclude the settlement discussions by a date certain. East Side could ill-afford to incur unnecessary litigation expenses if the parties were ultimately going to reach a settlement. This is why the New York Stipulation provides for a date certain, within a short time-frame after the date on which the parties signed the New York Stipulation.

44.     In accordance with the New York Stipulation, East Side paid Acosta $61,341 to resolve Acosta's claims against East Side, and Acosta was dropped from the New York Arbitration without prejudice.

B.      The Florida Stipulation

45.     In the Florida Arbitration, the parties agreed to dismiss the Florida arbitration without prejudice once East Side made the $61,341 payment also referenced in the New York Stipulation, as quoted above.

46.     The New York and Florida Stipulations were negotiated together, contained certain identical provisions and were signed at the same time. They were both part of a single transaction. Neither party would have entered into either of the stipulations without also entering into the other stipulation.

47.     Acosta and MatchPoint breached the New York Stipulation by failing and refusing to conduct and conclude good-faith settlement discussions by March 30, 2009, or at any later date.

48.     East Side has performed all conditions required to be performed under the New York and Florida Stipulations.

49.     As a result of Acosta's breach, East Side has suffered damages in an amount

to be determined at trial, but in no event less than $61,341.

## Seventh Claim
## Breach of Implied Covenant Of Good-Faith and Fair Dealing
## (Against Acosta and MatchPoint)

50.     East Side repeats the allegations of paragraphs 1 to 49 of the second

amended complaint.

51.     Under New York law, there is implied in the New York Stipulation a

covenant of good-faith and fair dealing.

52.     By entering into the New York Stipulation and agreeing to negotiate in

good-faith, Acosta and MatchPoint made an implied covenant to interpret its terms fairly and act

reasonably upon its promises.

53.     Acosta and MatchPoint acted oppressively and in bad-faith to deny East Side

the benefit of the parties' bargain.

54.     Acosta and MatchPoint breached the New York Stipulation's implied

covenant of good faith and fair dealing by, among things:

        (a)     Making unreasonable settlement demands, on terms and conditions that it
knew East Side had no ability to accept;

        (b)     Failing and refusing to make a reasonable, good-faith compromise of its
claims for services and disbursements, insisting that East Side pay 100% of the disbursements and
97% of the total amounts claimed due, knowing that East Side could not pay this amount and
continue operating;

        (c)     Failing and refusing to make a counter-offer in response to East Side's last
proposal;

           (d)   Failing and refusing  to give East Side the back-up to support its claim, notwithstanding that, upon information and belief, MatchPoint and Acosta had access to the back-up and knew that East Side could not properly evaluate or accept any settlement demands without having it; and

           (e)   After making it impossible for the parties to conclude their settlement discussions by March 30, 2009, failing and refusing to agree to a reasonable adjournment of the hearing dates in the New York Arbitration, knowing that forcing East Side to pursue settlement at the same time it was incurring litigation expenses placed an undue hardship upon East Side and made the prospect of settlement more remote.

           55.   As a result of Acosta's breach, East Side has suffered damages in an amount

to be determined at trial, but in no event less than $61,341.

**WHEREFORE,** East Side Entrees, Inc. demands judgment as follows:

A.     On its first claim, damages (including consequential damages) in an amount to be determined at trial, but in no event less than 10,000,000;

B.     On its second claim, damages (including consequential damages) in an amount to be determined at trial, but in no event less than 10,000,000;

C.     On its third claim, damages (including consequential damages) in an amount to be determined at trial, but in no event less than 10,000,000;

D.     On its fourth claim, damages in an amount to be determined at trial, but in no event less than 10,000,000;

E.     On its fifth claim, damages (including consequential damages) in an amount to be determined at trial, but in no event less than 10,000,000;

F.     On its sixth claim, damages in an amount to be determined at trial; but in no event less that $61,341.

G.     On its seventh claim, damages in an amount to be determined at trial, but in no event less that $61,341.

H.     The costs and disbursements of this action, including, without limitation, reasonable attorneys' fees; and

I.     Such other relief as the Court deems appropriate.

Dated:  New York, New York
       May 21, 2009

**INGRAM YUZEK GAINEN
CARROLL & BERTOLOTTI, LLP**

By: 

David G. Ebert (DE-4078)
Attorneys for Plaintiff, East Side Entrees, Inc.
250 Park Avenue
New York, New York 10177
(212) 907-9600

FSC
Mixed Sources

Cert no. SW-COC-002980
www.fsc.org
© 1996 Forest Stewardship Council

**Exhibit A**

# ACOSTA, INC.

## SALES AGENT CONTRACT

THIS Agreement is made this 26 day of, April, 2007 (the "Effective Date"), by and between East Side Entrees (CLIENT), a corporation organized under the laws of the State of NY, with its principal place of business at 20 Crossways Park North, Woodbury, NY  11797, and Acosta, Inc. d/b/a Acosta Sales & Marketing Company (SALES AGENT), a corporation organized under the laws of the State of Delaware, with its principal place of business at 6600 Corporate Center Parkway, Jacksonville, Florida 32216.

WHEREAS, CLIENT is a manufacturer and seller, of among other things, certain merchandise or products, as listed in Attachment A to this Agreement, and desires to secure the services of a SALES AGENT in the territory hereinafter described, to negotiate the sales of said merchandise or products in CLIENT'S name and for its account; and

WHEREAS, SALES AGENT is desirous of securing the exclusive right to negotiate sales of said CLIENT'S products or merchandise in the territory.

NOW THEREFORE, in consideration of the premises and covenants and undertakings herein contained.

### IT IS MUTUALLY AGREED AS FOLLOWS:

1) TERRITORY. CLIENT hereby appoints SALES AGENT, and SALES AGENT hereby agrees to act for CLIENT, as its (or his, as the case may be), sole and exclusive Representative for  negotiations of sales of the merchandise or products hereinabove enumerated, subject to the terms, provisions and conditions hereof, within the territory as described in Attachment B to this Agreement.

2) SALES NEGOTIATIONS. All sales negotiations by SALES AGENT for the account of CLIENT shall be conducted in accordance with such prices, terms and conditions as specified by CLIENT.

3) INDEPENDENT CONTRACTOR. It is further understood that SALES AGENT shall act as an Independent Contractor of CLIENT, that neither SALES AGENT nor its employees shall be considered employees of CLIENT, and neither party shall in any event be held liable or accountable for any obligations incurred by either party other than as specified herein, it being specifically understood that the respective businesses of each of the parties shall be operated separate and apart from each other.

4) CONFLICTS. In the event of product conflicts, both parties shall make every reasonable effort to reach an agreement on a method for SALES AGENT to represent the products involved.

5) APPLICABLE LAW. The laws of the State of Florida shall govern the application and interpretation of this Agreement.

6) ENTIRE AGREEMENT. It is understood that this Agreement cancels and supersedes any and all prior agreements, oral or written, made between the parties hereto, and can only be modified by an agreement in writing, signed by all applicable parties.

7) ARBITRATION. Any controversy or claim arising out of or relating to this Agreement shall be settled by arbitration in accordance with the rules of the American Arbitration Association and judgment may be entered in any court having jurisdiction thereof.

8) SOLICITATION OF EMPLOYEES. CLIENT and SALES AGENT agree that during the term of this Agreement and for a period of six-months thereafter, that neither party will solicit for hire, hire or otherwise encourage an employee of the other party to leave their current employment in any manner or for any reason whatsoever.

**THE CLIENT AGREES AS FOLLOWS:**

9) EXCLUSIVE REPRESENTATION. SALES AGENT shall be the sole and exclusive Sales Representative of CLIENT for negotiating sales of the merchandise and products herein specified in the described territory, and CLIENT will either (a) make no sales of said merchandise and products in such territory other than those negotiated by SALES AGENT, or (b) in case of sales made by CLIENT in such territory other than those negotiated by SALES AGENT, or on sales made otherwise for shipment of CLIENT'S merchandise or products into the said territory for resale CLIENT will pay SALES AGENT a commission or brokerage on the merchandise and products so sold at the rate specified in the following paragraph. Further, CLIENT agrees not to enter into any contract with any other Sales Representative in the territory specified herein during the life of this Agreement.

10) COMMISSIONS. To pay SALES AGENT without deduction or offset, a commission or brokerage, of 5.0% percent on each and every sale, as provided herein the said percentage rate of commission, or brokerage, to be computed on the price of the merchandise or products sold before discounts and allowances are figured, said brokerage payment to be made promptly within 15 days after the end of each month.

11) ELIGIBLE BUYERS. To permit SALES AGENT, consistent with the terms of this Agreement, to negotiate sales to any and all prospective Buyers of CLIENT'S said products throughout the entire territory defined in Attachment B, including all customer locations extending beyond the defined territory where the buying office is located within the defined territory or where the customer purchases CLIENT's products through a wholesaler located within the defined territory.

12) SHIPMENTS. To ship the merchandise or products sold as SALES AGENT may specify. CLIENT shall be given reasonable notice with respect to the required shipments. CLIENT accepts full responsibility for granting credit to Buyers.

13) SALES AND PROMOTIONAL POLICIES. To keep SALES AGENT fully informed on all sales and promotional policies and programs affecting the specified territory.

14) INDEMNIFICATION. If any claim or action be made or filed against SALES AGENT, claiming loss or injury of any nature whatsoever, as a result of defect in any merchandise, purchase or use of any product manufactured, produced, or distributed by CLIENT or for

2

actions by any employee of CLIENT, to defend, hold harmless and indemnify SALES AGENT from any and all loss or damage, costs and expenses, including legal fees, incurred by it.

### THE SALES AGENT AGREES AS FOLLOWS:

15) CLIENT'S INSTRUCTIONS.  To carryout CLIENT'S instructions with respect to the sales of the merchandise and products specified herein.

16) COMPETITIVE PRODUCTS.  To keep CLIENT informed with respect to the representation of a competitive product by SALES AGENT.

17) REPORTING PURCHASE ORDERS AND NEGOTIATIONS.  To promptly report all negotiations and purchase orders of specified merchandise and products for confirmation or approval by CLIENT, and in negotiating sales to prospective Buyers within the specified territory, to report negotiations to CLIENT.

18) ASSIST IN COLLECTIONS.  To assist CLIENT in effecting prompt and full payment by Buyers for all deliveries of merchandise and products sold.  The final determination as to credit and credit terms shall be made only by CLIENT.

19) CONTACT PROSPECTIVE BUYERS.  To contact prospective Buyers in the assigned territory in furtherance of sales of specified merchandise and products of CLIENT.

20) INDEMNIFICATION.  If any claim or action be made or filed against CLIENT, claiming loss or injury of any nature whatsoever, as a result of actions by any employee of SALES AGENT, to defend, hold harmless and indemnify CLIENT from any and all loss or damage, costs and expenses, including legal fees, incurred by it.

### DURATION OF AGREEMENT

21) TERM/TERMINATION.  This Agreement shall continue in full force and effect from year to year, provided that either party may terminate this Agreement for any reason by giving 30 days written notice of such intention to the other party.  Either party may terminate this Agreement without notice in the case of default by the other party to any of the terms of this Agreement.

a) In the event SALES AGENT elects to terminate this Agreement, it is understood that SALES AGENT will be paid commission earned, without deductions or offset, for all shipments of CLIENT'S products through the date of termination.

b) In the event CLIENT elects to terminate this Agreement, it is understood that SALES AGENT will be paid commission earned, without deductions or offset, for all shipments of CLIENT'S products through the date of termination and for a period of 30 days thereafter if Agreement is terminated without cause.

3

IN WITNESS WHEREOF, the parties hereto have signed this Agreement, thereunto duly authorized on the day and year above written.

East Side Entrees                          Acosta Sales and Marketing Company

By: _____        By: _____
    Glenn Gardone                              James C. Feeser
    V.P. - Sales                                V.P. – Operational Control
    (Title)                                     (Title)

4

Mixed Sources

Cert no. SW-COC-002980
www.fsc.org
© 1996 Forest Stewardship Council

Exhibit B

## -ADVERTISING AND PROMOTIONS AGENCY AGREEMENT

*THIS ADVERTISING AND PROMOTIONS AGENCY AGREEMENT* (the "Agreement") is made and entered into as of September 1, 2007 (the "Effective Date") by and between East Side Entrees with an office located at 20 Crossways Park North, Woodbury, NY 11797 ("Client") and MatchPoint Marketing, LLC with an office located at Four Penn Center West, Suite 400, Pittsburgh, Pennsylvania 15276 ("Agency") (jointly, the "Parties").

## RECITALS

A.     *WHEREAS,* Agency is an advertising and retail promotional agency providing advertising services and organizing retail promotional, marketing, and sweepstakes-related services to its clients;

B.     *WHEREAS,* Client desires to procure, on a non-exclusive basis, the services provided by Agency in the promotion of East Side Entrees' Breakfast Breaks; and

C.     *WHEREAS,* the Parties desire to establish terms and conditions which shall govern the provision of such services to Client from Agency.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises contained herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Client and Agency agree as follows:

1.     **SCOPE OF SERVICES.** Agency shall provide the Services for Client as set forth in Exhibit A and any additional Work Orders or Revised Estimates as issued by Agency and accepted by Client during the Term (as defined in Section 6 below). Agency and Client agree that all terms and conditions in any Exhibits, Work Order(s), and/or Revised Estimates issued hereunder and signed by Client, constitute(s) part of this Agreement and are incorporated into this Agreement by this reference. Should any inconsistency exist or arise between a provision of the Agreement and a provision(s) of any Exhibit, Work Order, and/or Revised Estimate, the provisions of the Exhibit, Work Order, and/or Revised Estimate shall prevail.

2.     **COMPENSATION.**
(a)     Client agrees to pay Agency the following fees for the Services as follows:

    1.     A monthly flat fee;
    2.     Work Order expenses;
    3.     Travel expenses (as specified in Section 2(d) below); and
    4.     Additional fees as approved by Client in accordance with Section 2(e).

(b)     **Flat Fee.** Client shall pay Agency a flat fee of Thirty-Five Thousand and 00/100 Dollars ($35,000.00) per month ("Flat Fee"). Agency shall submit an invoice to Client on or about the 15th day of each month. The Flat Fee includes the cost for all Services & Creative not including hard costs. Agency will provide a written hourly report to Client on or about January 15, 2008 for purposes of compensation reconciliation of actual hours versus Flat Fee. By no later than January 31, 2008, Agency will reimburse Client for an amount equal to the difference between (1) the total monthly flat fee that Client has paid to Agency; and (2) the number of hours that Agency recorded multiplied by the hourly rate attributable to each hour recorded over the cumulative time of this contract. In no event will Client be obligated to pay to Agency any amounts that exceed the total monthly flat fee that Client has paid to Agency unless under mutual written agreement.

Agency's current hourly rates are:

| | |
|---|---|
| Client Services | $115 |
| Media Planning | $95 |
| Media Buying | $95 |
| Copy Writing | $110 |
| Creative Concepting | $115 |
| Design & Revisions | $115 |
| Traffic | $95 |
| Production | $95 |
| Mobile Tour Coordination | $110 |

(c) **Work Order Expenses.** Agency shall invoice Client separately only for the hard costs/net billings, set forth in Exhibit B, associated with and approved by Client in writing in connection with any Work Order or Revised Estimate, including pre-approved amounts related to third party suppliers performing Services on Client's behalf.

(d) **Travel Expenses.** Client shall pay Agency for travel related expenses that are pre-approved by Client in writing and incurred during the Term of this Agreement. Agency agrees to comply with Client's Travel Policy when making all Agency travel arrangements. Agency travel, meals and lodging relative to any Client Services or Client requested travel shall be billed at the net out-of-pocket cost as part of the related Work Order. Under no circumstances shall Client reimburse Agency for First-Class travel.

(e) **Additional Fees.** If the Agency, at Client's written request, provides any other services not set forth in Exhibit A, it may charge Client additional fees as negotiated and agreed to by the Parties in writing.

3. **TAX OBLIGATIONS.** The expenses set forth in the applicable Work Orders are exclusive of tax and duty. Client shall pay all sales, use, excise, privilege, gross receipts or value added tax imposed on or in conjunction with the sales of taxable property or services to the Client and if applicable, agrees to reimburse Agency for any sales, use, excise, privilege, gross receipts or value added tax paid by Agency on behalf of Client that is related to the sale of taxable property or services. These items shall be billed to Client as separate items on invoices. If a transaction is exempt from the above-mentioned taxes, Client shall provide a valid exemption certificate or other evidence of such exemption in a form acceptable to the applicable taxing jurisdiction.

4. **NOTICE.** All notices shall be sufficiently given if delivered in person, sent by facsimile with confirmation sheet, by registered/certified mail, postage prepaid, or by prepaid overnight courier, addressed to the representatives provided below with a copy to East Side Entrees, 20 Crossways Park North, Woodbury, NY 11797. Such notice shall be deemed to have been given as of the date delivered or sent by facsimile.

| | |
|---|---|
| If to Client: | Amy Josephson<br>Vice President of East Side Entrees<br>20 Crossways Park North<br>Woodbury, NY 11797<br>Fax: (516) 364-7478 |
| With a copy to: | David G. Ebert<br>Ingram Yuzek Gainen Carroll & Bertolotti, LLP<br>250 Park Avenue – 6th Floor<br>New York, New York 10177<br>Fax: (212) 907-9681 |

If to Agency:        Jane Bass
                              Client Services Director
                              MatchPoint Marketing, LLC
                              Four Penn Center West
                              Suite 400
                              Pittsburgh, PA 15276
                              Fax: (412) 494-2477

With a copy to:     Drew W. Prusiecki, General Counsel
                              Acosta, Inc.
                              6600 Corporate Center Parkway
                              Jacksonville, FL 32216
                              Fax:  (904) 296-4566

**5.**     **TERM AND TERMINATION.**
(a)     The term of this Agreement shall be for four (4) months commencing September 1, 2007 through December 31, 2007 ("Term"). The Term may be extended upon mutual written agreement of the Parties.

(b)     Either party may terminate this Agreement with or without cause by giving the other party  ten days prior written notice of its intent to do so.  In the event of such termination, Client acknowledges and agrees that it shall pay Agency's Fees (on a pro-rated basis for any partial Monthly Fees due to Agency) and any costs incurred by Agency (including, but not limited to any costs associated with future commitments which Agency is unable to cancel and receive a refund), which Client has not already paid up through and including the date of termination. Agency shall furnish to Client all work product and other materials that Agency has created on Client's behalf up to and including the date of termination.

**6.**     **ENTIRE AGREEMENT; WAIVER; ASSIGNMENT.** This Agreement, Exhibit A, and any Client Sweepstakes Indemnity Agreement signed by Client constitutes the Parties' entire understanding of the matters set forth herein and supersedes any prior understanding or agreement the Parties may have. This Agreement may only be modified in a writing signed by the Parties hereto.  No waiver of any provision or of any breach of this Agreement shall constitute a waiver of any other provisions or any other or further breach, and no such waiver shall be effective unless made in writing and signed by an authorized representative of the party to be charged with such a waiver.  Neither party shall assign this Agreement without the other party's prior written consent.

**7.**     **APPROVAL.**  Materials will be subject to timely written approval by Client.  Agency shall incorporate all changes requested by Client.  Should Client fail to approve or disapprove any materials or revisions within written agreed-upon time periods, at Client's sole cost and expense, Agency may adjust any shipping date to dates upon which Agency can deliver given the delays, the time required to incorporate the changes, and to meet other production commitments.

**8.**     **INDEMNIFICATION.** Agency shall indemnify Client and Client's employees, officers, directors, members, shareholders, affiliates and agents against any loss, cost, liabilities and expenses (including reasonable attorneys' fees) Client or such other party may incur as a result of any claim pertaining to libel, slander, infringement, invasion of privacy, piracy or plagiarism or any other violation of any third-party rights arising from (1) any material supplied by Agency for advertising or publicity prepared by Agency for Client; or (2) any breach by Agency of the terms of this Agreement.

9.     **CONFIDENTIAL INFORMATION.**  Agency is under a duty not to disseminate, or use for any purposes, both during and after the termination of this Agreement, any "confidential information" imparted to Agency by Client.  "Confidential Information" in regard to these contractual obligations will mean any information imparted to Agency by Client except:

    a.     Information that is or becomes known publicly through no fault of Agency;

    b.     Information received by Agency from a third party entitled to disclose it; or

    c.     information already known to Agency before received from or developed for Client as shown by Agency's prior written records.

10.    **WORK-FOR-HIRE.**  Ideas, plans, musical themes, slogans and any other creative production advertising developed by Agency for Client shall be the sole and exclusive property of Client as a "work for hire" within the meaning of the Copyright Act and at common law.

11.    **REMEDIES.**  Any action or proceeding arising under or relating to this Agreement hereunder shall be governed under the laws of the State of New York and shall be determined in New York City, before a single arbitrator under the supervision and rules of Judicial and Mediation Services ("JAMS").

IN WITNESS WHEREOF, the parties by their undersigned representatives hereby execute this Agreement.

"Agency"

MatchPoint Marketing, LLC

By: Jane Bass
Its: Client Services Director

"Client"

East Side Entrees

By: Amy Josephson
Its:  Vice President

250627_1/02012-001                              4

**EXHIBIT A**

**SERVICES**

Agency will develop a national advertising plan that will include a variety of tactical options for Client in 2008.

The primary services provided by Agency ("Services") shall include, but are not limited to:

- Research and recommend national advertising plan including, but not limited to, television, print, outdoor, radio, interactive, direct mail, FSI, POS, mobile tour, and guerilla marketing tactics.
- Media planning and buying for recommended national advertising plan.
- Creative concepting & ideation, design and revisions for elements encompassed in national advertising plan.
- Develop a series of strong account specific concepts, based on research and analysis that can be translated into creative strategies utilizing Client current brand equity and positioning.
- Develop Brand Standards and Style Guide.
- Execute and manage all aspects of national media plan.
- Provide post-promotional analysis as measured by IRI or AC Nielsen.
- Provide competitive market insights – retailer and brand, as requested.
- Intelligence.
- Accounting.
- Administrative duties.
- Presentations.

To accomplish these Services, Agency will perform the following:

1. Brand research – Agency will access Nielsen Home Scan information, Spectra data and syndicated data as required to examine brand, competition, strengths, weaknesses, opportunities, threats, target audience and consumer psychographics. From these databases, Agency will provide insights that can guide consumer marketing decisions. Agency will share data to ensure that Agency is focusing on the right accounts at the right time. Agency will also request brand information on an as needed basis as programs are developed.

2. Concept and Creative Development – Based on strategic marketing objectives, Agency's account/creative team will work with Client in developing concepts with attention to national and account specific promotional execution. Agency will also use Client's developed artwork and images when necessary.

## EXHIBIT B

### WORK ORDER EXPENSES

Client shall reimburse Agency for the hard costs/net billings (without mark-up) associated with approved Work Orders.

Such hard costs/net billings may include, but are not limited to, the following:

- media programs, such as broadcast advertising, internet tie-ins, print, outdoor and other "out of store" executions.
- retailer loyalty card tie-ins costs,
- free standing inserts (FSI) costs,
- POS costs which include but are not limited to banners, header cards, static clings, stanchion signs
- costs associated with implementing contests and sweepstakes,
- third party supplier costs,
- third party product costs for products such as Catalina, News America Showcase, Showcase Plus, Retailer Connection, Price Feature Plus, and / or Smart Source, and/or

All expenses must be pre-approved in writing by Client.

**Exhibit C**

JUDICIAL AND MEDIATION SERVICES
NEW YORK, NEW YORK
_____X
                                        :
EAST SIDE ENTREES, INC.,                :        Ref No.:  1425002637
                                        :
        Claimant,                       :
                                        :
        -against –                      :
                                        :
ACOSTA, INC. and MATCHPOINT             :
MARKETING, LLC                          :
                                        :
        Respondents.                    :
_____X

## STIPULATION OF DISMISSAL WITHOUT PREJUDICE AS TO ACOSTA

East Side Entrees, Inc. ("East Side") and Acosta, Inc. ("Acosta") hereby stipulate as follows:

1.     Acosta shall be dismissed from this arbitration proceeding without prejudice.  The claims of East Side against MatchPoint Marketing, LLC ("MatchPoint") and MatchPoint against East Side shall remain unaffected.  The final hearing date shall remain the same. East Side and MatchPoint Marketing shall conduct and conclude further good-faith settlement discussions by no later than March 30, 2009.

2.     Acosta and East Side shall bear their own costs and fees as against each other in this matter.

3.     Should East Side choose to reinstitute its claims or otherwise assert a claim against Acosta that is subject to the arbitration provision in the contract between East Side and Acosta, East Side will do so in Jacksonville, Florida through AAA arbitration.  In the event that East Side  initiates such an action against Acosta, Acosta may institute appropriate counterclaims

*JAMS STIP OF DISMISS (2) (5)*

to include its claim to the balance of what it claims East Side owes after East Side's payment to Acosta (the "Additional Amount") contemporaneous with this stipulation (as set forth in paragraph 4 below). Acosta will assert its claim for the Additional Amount only if East Side first commences an action.

4.     East Side shall pay to Acosta care of its undersigned counsel the sum of $61,341.00 by delivering said funds no later than March 23, 2009.

5.     In the course of this arbitration between MatchPoint and East Side, Acosta will produce otherwise discoverable documents and any Acosta employed witnesses without need for subpoena at mutually agreeable times and places.

Dated this ___ day of March, 2009.

INGRAM, YUZEK, GAINEN, CARROLL &
BERTOLOTTI, LLP

By: _____
    David G. Ebert, Esquire
    250 Park Avenue
    6th Floor
    New York, NY 10177
    Telephone: (212) 907-9603
    Facsimile: (212) 907-9681

Attorney for Claimant, East Side Entrees,
Inc.

VOLPE, BAJALIA, WICKES, ROGERSON
& WACHS

By: _____
    Adam S. Wachs, Esquire
    Florida Bar No.: 980160
    501 Riverside Avenue, 7th Floor
    Jacksonville, FL 32202
    Telephone: (904) 355-1700
    Facsimile: (904) 355-1797

Attorney for Respondent Acosta, Inc.
Attorney for Respondent and
Counterclaimant MatchPoint
Marketing, LLC

JAMS STIP OF DISMISS (2) (3)

Mixed Sources

Cert no. SW-COC-002980
www.fsc.org
© 1996 Forest Stewardship Council

**Exhibit D**

## AMERICAN ARBITRATION ASSOCIATION

```
_____ X
                                  :
ACOSTA, INC.                      :
                                  :
                    Claimant,     :
                                  :    Case Number: 33 181 00483 08
        – against –               :
                                  :    Case Manager:  Nyasha Delaney
EAST SIDE ENTREES, INC.,          :
                                  :
                    Respondent.   :
_____ X
```

### STIPULATION OF DISMISSAL WITHOUT PREJUDICE

East Side Entrees, Inc. ("East Side") and Acosta, Inc. ("Acosta") do hereby stipulate as follows:

1. Acosta and East Side agree to dismiss this arbitration proceeding without prejudice once East Side has made the payment set forth in paragraph 4 below.

2. Acosta and East Side shall bear their own costs and fees of this arbitration as against each other.

3. Should East Side choose to reinstitute its claims or otherwise assert a claim against Acosta that is subject to the arbitration provision in the contract between East Side and Acosta, East Side will do so in Jacksonville, Florida through AAA arbitration.  In the event that East Side initiates such an action against Acosta, Acosta may institute appropriate counterclaims to include its claim to the balance of what it claims East Side owes after East Side's payment to Acosta (the "Additional Amount") contemporaneous with this stipulation (as set forth in paragraph 4 below). Acosta will assert its claim for the Additional Amount only if East Side first commences an action.

AAA STIP (2)

4. East Side shall pay to Acosta care of its undersigned counsel the sum of $61,341.00 by delivering said funds no later than March 23, 2009.

Dated this 18th day of March, 2009.

VOLPE, BAJALIA, WICKES, ROGERSON & WACHS

By: _____
Alan S. Wachs, Esquire
Florida Bar No.: 980160
501 Riverside Avenue, 7th Floor
Jacksonville, FL 32202
Telephone: (904) 355-1700
Facsimile: (904) 355-1797

Attorney for Claimant, Acosta, Inc.

INGRAM, YUZEK, GAINEN, CARROLL & BERTOLOTTI, LLP

By: _____
David G. Ebert, Esquire
250 Park Avenue
6th Floor
New York, NY 10177
Telephone: (212) 907-9603
Facsimile: (212) 907-9681

Attorney for Respondent East Side Entrees, Inc.

AAA Stip (2)